FILED

DEC 05 2017

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JESSE J. WALN,<br>JEREMIAH R. WALN,<br>DOMINIC JOSEPH STONEMAN<br><br>Defendants. | 3:17-CR-30004(01)(02)(04)-RAL<br><br>OPINION AND ORDER DENYING<br>MOTIONS TO SUPPRESS |

Tribal police received information that Jeremy Waln, Jesse Waln, and Dominic Stoneman were involved in one or more burglaries in Mission, South Dakota. The police executed a search warrant on the Walns' home and found guns and other items that had been reported stolen. Following the search, tribal police questioned Jesse while he was in jail. Stoneman and the Walns moved to suppress evidence seized from the Walns' home. Docs. 134, 136, 161. Jesse also moved to suppress his statements to tribal police and the buccal swabs he provided during his interview. Magistrate Judge Mark A. Moreno conducted an evidentiary hearing and then recommended denying the defendants' motions. The defendants have now objected to that recommendation. Docs. 235, 243, 244. For the reasons explained below, this Court denies the defendants' motions to suppress.

I. **Facts**

Brothers Jeremy and Jesse Waln lived with their mother Debra Waln in Mission, South Dakota. Debra's neighbors included Patricia Burnette, who lived across the street, T. 27, Ex. 4,

1

and Beau Westover, who lived roughly three to four blocks east of Debra next to the Cherry Todd Electric Building, T. 28, Ex. 4.

Burnette's home was burglarized in May 2016. T. 25. The thieves took cash, jewelry, and electronics, as well as a poster autographed by basketball legend Michael Jordan. Ex. 2. Westover's home was burglarized approximately six months later over Veterans Day weekend. T. 32. Many items were stolen from Westover's home, including fourteen firearms and multiple boxes of ammunition. T. 24, 32; Ex. 2.

While investigating the Westover burglary, tribal police discovered that someone had cut two holes in the fence surrounding the Cherry Todd lot. One hole was on the west side of the lot near Debra Waln's house, and the other hole was on the east side of the lot next to Westover's home. Ex. 4a; T. 24, 28–31.

On November 17, 2016, Robert Sedlmajer, a special agent with the Rosebud Sioux Tribe, received information that Bobbi Bush had the autographed Michael Jordan poster stolen from Burnette's home. T. 34–35. Bush told Agent Sedlmajer that Jesse Waln had given her the poster and tried to sell it to her for $2,500. T. 35, 42. Agent Sedlmajer took the poster and confirmed with Burnette that it was the poster stolen from her home. T. 43.

Shortly after recovering the poster, Agent Sedlmajer received a call from Marlin Enno, Rosebud's chief law enforcement administrator, saying that the police had located items stolen from the Westover residence. T. 36. Chief Enno explained that Star Eastman had come to the police department to speak with Calvin Waln Jr., a captain with the Rosebud police (Captain Waln) and the brother of Jesse and Jeremy. According to Chief Enno, Eastman told Captain Waln that Jeremy and Jesse had taken[1] firearms from a house and had hid some of them in a tree

---

[1] Agent Sedlmajer's account of what Chief Enno told him is:

2

line near the home of their father, Calvin Waln Sr. T. 39. Chief Enno relayed that he and other officers had then gone to Calvin Sr.'s home where they found a Benelli shotgun and other items in a nearby tree line. T. 36, 39–40. Agent Sedlmajer confirmed with Westover that the Benelli shotgun found in the tree line had been stolen from Westover's home. T. 38.

Agent Sedlmajer also spoke to Captain Waln about his conversation with Eastman. T. 40–41. Captain Waln explained that Eastman had told him that Jeremy, Jesse, Stoneman, and others had broken into a house near the Cherry Todd building and stolen firearms and other items, T. 41, 105, 128, 132, 140, 141,143, 152; Def. Ex. C; that she saw Jeremy with four of the stolen guns, including a shotgun, while at Debra's residence, T. 39, 41, 105,140, Ex. C; and that she said that Jeremy had hidden guns and other stolen property in the tree line near Calvin Sr.'s home, T. 140, 143, 151–52, Ex. C.

Based on the evidence police had recovered from Calvin Sr.'s property and the information from Eastman, Burnette, and Westover, Agent Sedlmajer prepared an affidavit for a search warrant for Debra's house. T. 41–43. Agent Sedlmajer then telephoned a tribal judge, explained that he was applying for a warrant, and faxed the judge the affidavit and an inventory list of the stolen items the police would be looking for in Debra's house. T. 47–48, 110. After receiving the affidavit, the tribal judge called Agent Sedlmajer back and had him read the affidavit aloud. T. 47–48, 110–13. The tribal judge placed Agent Sedlmajer under oath and Agent Sedlmajer confirmed that everything in the affidavit was correct. T. 47–48, 110–13. The

---

> Star Eastman tells Captain Waln that Jeremy and Jesse were involved in going into some house--she didn't know whose house it was--over an extended period of time, bringing things back to include firearms. She was with them when they took some of the firearms out to Calvin Waln, Sr.'s house and drop them off, hid them in a tree row, hid them in cars, she knew that.

T. 39.

3

tribal judge did not ask Agent Sedlmajer any questions and Agent Sedlmajer did not provide him any information beyond that contained in the affidavit. T. 49, 113.

The tribal judge granted a warrant to search Debra's residence for the items listed in the inventory Agent Sedlmajer had provided. Ex. 2. Jeremy and Jesse were home when officers executed the warrant on the evening of November 17, 2016. T. 51. The officers arrested Jeremy and Jesse after finding items belonging to Westover and Burnette in the home. T. 55–56.

Agent Sedlmajer and Kory Provost, a special agent with the Tribe, interviewed Jesse at the Rosebud jail the next day. T. 57, 60. Agent Sedlmajer read Jesse his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and Jesse agreed to speak with the agents. T. 59–61; Ex. 3. Jesse made incriminating statements and agreed to provide a buccal swab. T. 65–69.

A few months later, a grand jury indicted Jeremy and Jesse for burglary, larceny, and possession of stolen firearms. Doc. 1. Stoneman was indicted for burglary and larceny. Doc. 1. Judge Moreno recommended denying the defendants' motions to suppress, finding that Stoneman lacked standing to challenge the search of Debra's home, that the evidence seized from the home was admissible under the good-faith exception in United States v. Leon, 468 U.S. 897 (1984), that Jesse executed a valid waiver of his Miranda rights, and that Jesse's statements and consent to the buccal swabs were voluntary.

This Court reviews a report and recommendation under the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Having conducted a de novo review, this Court adopts the report and recommendation in full.

**II.     Analysis**

### A. Stoneman's ability to challenge search of Debra's house

As Judge Moreno explained, Fourth Amendment rights are personal and may not be asserted vicariously. United States v. Trejo, 135 F. Supp. 3d 1023, 1030 (D.S.D. 2015). Thus, a defendant challenging the constitutionality of a search under the Fourth Amendment must establish that he himself had "a legitimate expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143 (1978). To meet this burden, the defendant must show that he exhibited a subjective expectation of privacy in the place searched and that this expectation is objectively reasonable. Trejo, 135 F. Supp. 3d at 1030. Stoneman has failed to meet this burden because he has neither explained how he had a legitimate expectation of privacy in Debra's home nor offered any evidence to suggest that such an expectation existed. His motion to suppress is therefore denied.

### B. Good-faith exception

Under Leon, the exclusionary rule does not apply when police perform a search in "objectively reasonable reliance" on a warrant later found to be invalid. 468 U.S. at 922; Massachusetts v. Sheppard, 468 U.S. 981, 987–91 (1984). The rationale for this "good-faith" exception is that excluding evidence in cases where the police have a reasonable good-faith belief that a warrant is valid would do little to deter police misconduct. Leon, 468 U.S. at 919–21. An officer's reliance is not objectively reasonable, and the good-faith exception is therefore inapplicable, in four circumstances: (1) when the warrant is based on knowingly or recklessly made falsehoods in the officer's affidavit; (2) when the issuing judge has "wholly abandoned his judicial role;" (3) when the information provided to the judge includes so little indicia of probable cause that the officer's belief in its existence is "entirely unreasonable;" and (4) when a warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the

things to be seized—that the executing officers cannot reasonably presume it to be valid." Id. at 923.

The defendants' main argument against the good-faith exception is that the affidavit was so lacking in probable cause that Agent Sedlmajer's belief in its existence was "entirely unreasonable." Probable cause to search "exists if the warrant application and affidavit describe circumstances showing 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Montes-Medina, 570 F.3d 1052, 1059 (8th Cir. 2009) (quoting Illinois v. Gates, 462 U.S. 213, 238–39 (1983)). Here, the affidavit explained that the Burnette and Westover residences had been burglarized of the items listed in the attached inventory, including an autographed Michael Jordan poster from the Burnette home and a Benelli Super Nova 12 gauge shotgun from the Westover home. Ex. 2. In recounting Captain Waln's interview with Eastman, the affidavit described how Eastman had said she was at Jeremy's residence (that is, Debra's home) from November 13 through November 16, 2016, that she had seen firearms at Jeremy's residence, and that she had gone with Jeremy to Calvin Sr.'s property where Jeremy "left some of the items," including a "black shotgun." Ex. 2. Other tribal police officers, the affidavit explained, had found a Benalli Super Nova shotgun in a tree grove north of Calvin Sr.'s residence. The affidavit also described how tribal police confirmed with Burnette that the autographed Michael Jordan poster Bush had received from Jesse had been stolen from Burnette's home.

There is no doubt that there are factual gaps in the affidavit, some of which are due to Agent Sedlmajer's failure to include information known to him when he applied for the warrant. In the Eighth Circuit, however, courts assessing an officer's good-faith reliance on a search warrant look beyond the affidavit "and consider the totality of the circumstances, including what

the officer knew but did not include in the affidavit." United States v. Farlee, 757 F.3d 810, 819 (8th Cir. 2014); see also United States v. Guzman, 507 F.3d 681, 685 (8th Cir. 2007) (explaining that courts may consider information known by the officers but not disclosed to the issuing judge when deciding whether the officers reasonably relied on a warrant). In addition to the information in the affidavit, Agent Sedlmajer knew that Eastman had said that Jeremy, Jesse, and Stoneman had taken firearms from a house near the Cherry Todd building. Agent Sedlmajer also spoke with Westover, the owner of the home near the Cherry Todd building, and confirmed that the shotgun found on Calvin Sr.'s property had been stolen from Westover's home.

Considering the totality of the circumstances, an officer could reasonably believe that there was a constitutionally sufficient nexus between Debra's home where Jeremy and Jesse resided and their alleged criminal activity. After all, Eastman reported that Jeremy and Jesse had stolen some guns and that she had seen some of these guns at Debra's home a few days before the police applied for and executed the search warrant. See United States v. Cowling, 648 F.3d 690, 696 (8th Cir. 2011) ("Because the warrant affidavit established probable cause that [the defendant] possessed stolen firearms, it follows that probable cause existed to search [the defendant's] residence, because people 'generally keep [firearms] at home or on their persons.'") (third alteration in original) (quoting United States v. Steeves, 525 F.2d 33, 38 (8th Cir. 1975)). Debra's home was also a likely place to store the stolen property; Jeremy and Jesse lived at Debra's house in close proximity to the Westover and Burnette burglaries, and the holes in the fence surrounding the Cherry Todd lot suggested that the thieves had created a shortcut between Westover's residence and the area near Debra's home. United States v. Jones, 994 F.2d 1051, 1057 (3d Cir. 1993) (explaining that the proximity of the suspect's home to a robbery made the home "a likely repository for evidence"). And while Agent Sedljmajer testified that some stolen

7

items "move fast," T. 104, the sheer volume of the items stolen from the Westover and Burnette residences suggests that the thieves would still possess some of the items, see Ex. 2. It was reasonable to infer that some of the property stolen in the Westover and Burnette burglaries would be found in Debra's home. See United States v. Ross, 487 F.3d 1120, 1123–24 (8th Cir. 2007) (finding that officers could reasonably believe that there was a sufficient connection between a drug transaction and the defendant's home where the officers had seen the same truck at the defendant's residence that the defendant was driving when he met with coconspirator); United States v. Sulanke, 121 F.3d 713 (8th Cir. 1997) (unpublished opinion) (finding, on a record containing less evidence of probable cause than is present here, that officers had a reasonable belief that they had probable cause to search the defendant's residence for evidence of a burglary).

The defendants assert that Agent Sedlmajer's investigation leading up to the warrant was so perfunctory that he could not reasonably believe he had probable cause. They argue that Eastman was unreliable and that Agent Sedlmajer should have corroborated her statements by speaking with her personally. The investigation here was sufficient to make Agent Sedlmajer's reliance on the warrant objectively reasonable. First, personal contact between an informant and the officer drafting the warrant is not always necessary to establish probable cause. United States v. Fiorito, 640 F.3d 338, 346 (8th Cir. 2011) ("[T]here is no requirement that an affiant have first-hand knowledge of every allegation he includes in his affidavit."); United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996) (explaining that personal contact with an informant is "not invariably required"). It was enough for purposes of the good-faith exception that Captain Waln and Chief Enno told Agent Sedlmajer what Eastman had said. See Farlee, 757 F.3d at 819 (finding that the good-faith exception applied even though the officer applying for

8

the search warrant based his affidavit on an investigation conducted by another officer). Second, Agent Sedlmajer did not simply rely on what other officers told him about Eastman's interview; he corroborated what she had said by confirming that the shotgun found in the tree line near Calvin Sr.'s residence belonged to Westover. T. 38. An informant's statements are "more likely to be reliable" when officers independently corroborate the statements as Agent Sedlmajer did here. United States v. Clay, 646 F.3d 1124, 1127 (8th Cir. 2011); see also United States v. Warford, 439 F.3d 836, 841 (8th Cir. 2006) ("Even where an informant does not have a track record of supplying reliable evidence, the information may be considered reliable if it is corroborated by independent evidence."). Third, Eastman said that she had actually seen the stolen firearms and she described the color and appearance of some of them. T. 132, 140–41; Ex. C. Eastman's first-hand observations are more compelling than information based on hearsay. United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994) ("[T]here is an inherent indicia of reliability in 'the richness and detail of a first hand observation.'" (quoting United States v. Jackson, 898 F.2d 79, 81 (8th Cir. 1990))); see also United States v. Hallam, 407 F.3d 942, 946 (8th Cir. 2005) (affidavit that failed to provide sufficient facts establishing the reliability of the informant but included some "fairly specific" first-hand observations by the informant was not so lacking in probable cause that the officer's reliance on the warrant was "entirely unreasonable").[2]

---

[2]In the section of their brief arguing that probable cause is lacking, the defendants contend that Agent Sedlmajer should have informed the tribal judge of Eastman's "motive" for speaking to Captain Waln because this information was relevant to Eastman's credibility. Doc. 235 at 5. Eastman has two children with Jeremy. T. 82, 128; Ex. C. When speaking with Captain Waln about the stolen property, Eastman asked what would happen to the children if Jeremy were arrested. T. 134; Ex. C. According to the defendants, Eastman's motive for speaking with Captain Waln was getting her children back. Doc. 235 at 5. To the extent the defendants are arguing that the good-faith exception does not apply because Agent Sedlmajer recklessly omitted information about Eastman's motive, this argument is unconvincing. Omissions about an

The defendants also argue that the good-faith exception is inapplicable because the tribal judge abandoned his judicial role by acting as a "rubber stamp" for the police. According to the defendants, the tribal judge must have acted as a rubber stamp because the affidavit failed to establish probable cause and the judge never questioned Agent Sedlmajer. However, the defendants' probable cause assertion is merely "another way of phrasing the argument that no one who relied upon the affidavit could have been objectively reasonable, an argument that [this Court] has already rejected." United States v. Sager, 743 F.2d 1261, 1267 (8th Cir. 1984); see also United States v. Clark, 638 F.3d 89, 101 (2d Cir. 2011) ("[L]egal error by the issuing judge in identifying probable cause does not, by itself, indicate the sort of wholesale abandonment of the judicial role discussed in Leon."). And while the tribal judge should have been more demanding of Agent Sedlmajer, his failure to ask any questions does not alone justify finding that the judge acted as a rubber stamp. See Hallam, 407 F.3d at 946 (rejecting argument that magistrate judge who was "anxious" to return to bed and did not ask any questions about a

---

informant's motives become less important when, as here, the informant provides a detailed description of her first-hand observations and the police are able to corroborate the informant's statements. United States v. Thompson, 139 F. App'x 724, 731 (7th Cir. 2005); Gates, 462 U.S. at 234 ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case."). Moreover, even if Eastman's motive for speaking with Captain Waln was getting her children back, she would have had little reason to lie. Eastman had to recognize that she could be held accountable for lying to the police and that she would not get her children back unless the information she provided turned out to be true. Notwithstanding arguments about Eastman's supposed motive for speaking with Captain Waln, this Court cannot conclude that the affidavit was misleading or that Agent Sedlmajer recklessly omitted information from the affidavit. See United States v. Carnahan, 684 F.3d 732, 735 (8th Cir. 2012) ("[B]ecause a warrant application need only show facts establishing probable cause, reckless [disregard for the truth] may be inferred from the omission of information from an affidavit only when the material omitted would have been clearly critical to the finding of probable cause." (quoting United States v. Smith, 581 F.3d 692, 695 (8th Cir. 2009))); United States v. Caswell, 436 F.3d 894, 899 (8th Cir. 2006) ("[B]ecause the police corroborated part of what the informant said, an attack upon the informant's reliability is not crucial to finding probable cause.").

search warrant had abandoned his judicial role). The defendants have not shown that the tribal judge was biased or impartial, and the evidence undercuts any claim that the judge blindly approved the warrant without any consideration. Indeed, before issuing the warrant, the tribal judge received the affidavit and then had Agent Sedlmajer read it aloud. Compare United States v. Tagbering, 985 F.2d 946, 951 (8th Cir. 1993) (rejecting argument that issuing judge's "five-minute perusal" of an affidavit "was no more than a rubber stamp approval"), with United States v. Decker, 956 F.2d 773, 777 (8th Cir. 1992) (finding that a judge had abandoned his judicial role because, among other problems, he signed a warrant without reading it or the accompanying affidavit). At bottom, the record does not justify finding that the tribal judge wholly abandoned his judicial role.

The defendants' final argument against the good-faith exception is that it should not apply because Agent Sedlmajer was not under oath when he signed the affidavit. In addition to a signature block for Agent Sedlmajer, the affidavit had a signature block for the tribal judge just below the words "SUBSCRIBED AND SWORN BEFORE ME, A JUDGE, ON THIS 17th DAY OF NOVEMBER, 2016." Ex. 2. The Fourth Amendment requires that probable cause to support a search warrant be supported by "Oath or affirmation." U.S. Const. amend. IV. Agent Sedlmajer testified that he was not under oath when he signed the affidavit despite the statement in the affidavit saying it had been "subscribed and sworn" before a tribal judge. T. 111. But Agent Sedlmajer also testified that the tribal judge administered an oath after Agent Sedlmajer read the affidavit aloud and Agent Sedlmajer then confirmed that everything therein was correct. T. 47–48, 111–12. Although that handling of the "Oath or affirmation" requirement is substantially less than ideal, the defendants have not cited any cases suggesting that these circumstances violate the Fourth Amendment. It would be illogical to hold that Agent

11

Sedlmajer's pre-oath signature undercut his good-faith belief in the validity of the warrant when he was actually placed under oath and confirmed that the affidavit was accurate. But even assuming that the warrant was not supported by oath or affirmation, the good-faith exception would still apply. Multiple courts, including this Court and the Eighth Circuit, have applied the good-faith exception in cases where the warrant or supporting affidavit was unsworn. United States v. Hessman, 369 F.3d 1016, 1018–23 (8th Cir. 2004) (applying the good-faith exception to a warrant obtained by fax and telephone even though the deputy had not signed the warrant application and the issuing judge did not place the deputy under oath or talk to him about the facts supporting the warrant); United States v. Richardson, 943 F.2d 547, 548, 550–51 (5th Cir. 1991) (holding that the good-faith exception applied to an unsigned warrant even though the issuing judge, in a telephone conversation, did not require an oath or affirmation); United States v. Medearis, 775 F. Supp. 2d 1110, 1120–23 (D.S.D. 2011) (collecting cases and applying the good-faith exception to a telephonic search warrant despite the issuing judge's failure to place the officer under oath).

C.     **Seizure of Evidence at Debra's house**

The defendants' argument about the seizure of evidence is based on Agent Sedlmajer's somewhat confusing testimony at the suppression hearing. Agent Sedlmajer responded "Yes" when Judge Moreno asked whether tribal officers had seized items from Debra's house that were not on the inventory attached to the search warrant. T. 113. When asked which unlisted items police had seized, Agent Sedlmajer described seeing a cordless drill bearing the initials "BW" and some leather boots. T. 114–15. He explained that although the drill and "leather dress boots" were on the inventory, he had called Westover to Debra's home to confirm that these items did, in fact, belong to Westover. T. 114–15; Ex. 2. Attempting to clarify Agent

Sedlmajer's answer, Judge Moreno asked again whether the police had seized any unlisted items. T. 115. Agent Sedlmajer responded "Yes and no," and referred to a 204 Savage rifle listed on the inventory as an example of what he meant. T. 115. Although the rifle had a scope on it when it was stolen from Westover's home, the scope had been removed by the time officers found the rifle at Debra's house. T. 115–16. Westover identified the scope that had originally been on the rifle, so Agent Sedlmajer seized the scope even though it was not specifically listed on the inventory. T. 115–16. The defendants did not ask Agent Sedlmajer any further questions about what unlisted items may have been seized during the search.

Citing to Agent Sedlmajer's testimony, the defendants now argue that the police seized "additional items" that were not on the inventory. Doc. 235 at 7. However, the defendants do not identify any specific items they claim were seized illegally. To the extent the defendants are arguing that the scope should be suppressed, this Court finds that the warrant's authorization to seize the 204 Savage rifle also authorized the police to seize the scope that was attached to the rifle when it was stolen. See Mountain Pure, LLC v. Roberts, 814 F.3d 928, 933 (8th Cir. 2016) ("[O]fficers executing a search warrant are not obliged to interpret it narrowly." (quoting McClendon v. Story Cty. Sherrif's Office, 403 F.3d 510, 517 (8th Cir. 2005))); United States v. Butler, 793 F.2d 951, 953 (8th Cir. 1986) (holding that warrant's "generic reference" to explosives authorized the seizure of component parts of hand grenades).

The defendants also argue that Westover's presence at Debra's home during the search violated their Fourth Amendment rights. "The general touchstone of reasonableness which governs Fourth Amendment analysis . . . governs the method of execution of the warrant." United States v. Ramirez, 523 U.S. 65, 71 (1998). Agent Sedlmajer testified that Debra's home where Jeremy and Jesse resided looked "like a hoarder's house," with things "stacked three feet

13

high" in one of the bedrooms. T. 52–53. The police were having such a difficult time identifying the items on the inventory that Agent Sedlmajer called Westover to come assist them. T. 53. Under these circumstances, it was objectively reasonable for the officers to use Westover, the victim of one of the burglaries, to help them identify the stolen property listed on the inventory. United States v. Gregoire, 638 F.3d 962, 967 (8th Cir. 2011) (holding that execution of a warrant was reasonable where officers, who encountered a "massive cache of items that appeared to fall within the universe of suspected thefts," allowed the victim of the thefts into the suspect's home to help identify the stolen items); see also Wilson v. Layne, 526 U.S. 603, 611–12 (1999) ("Where the police enter a home under the authority of a warrant to search for stolen property, the presence of third parties for the purpose of identifying the stolen property has long been approved by this Court and our common-law tradition.").

### D. Jesse's Statements and buccal swabs

Jesse argues that his statements at the Rosebud jail are inadmissible because they were involuntary under the Fifth Amendment and because he never executed a valid waiver of his Miranda rights. He also argues that the buccal swabs were taken involuntary. Judge Moreno rejected all three of these arguments. Citing Jesse's receipt of Miranda warnings, the lack of any police coercion, and Jesse's background and conduct during the interview, Judge Moreno concluded that Jesse's statements were voluntary. See Dickerson v. United States, 530 U.S. 428, 444 (2000) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984))); United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc) (discussing standard for determining whether a statement was voluntary). He also found that Jesse had

knowingly and voluntarily waived his Miranda rights because, among other reasons, Jesse was never subject to any police overreaching, Agent Sedlmajer read Jesse his rights aloud, and Jesse agreed to waive his rights orally and in writing. T. 61–62, 70; Ex. 3; Ex. 5 at 04:30–42; see Colorado v. Spring, 479 U.S. 564, 573–74 (1987) (setting forth standard for knowing and voluntary waiver of Miranda rights); North Carolina v. Butler, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver . . . ."). As for the buccal swabs, Judge Moreno concluded that Jesse's consent was voluntary because there was no police coercion, Jesse was a thirty-year-old high school graduate who had experience with the criminal justice system, and Jesse consented to giving the buccal swabs orally and in writing. Ex. 5 at 31:35–32:05, 35:25–36:10; see United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000) (discussing standard for determining whether consent to search was voluntary).

This Court agrees with Judge Moreno's factual findings and legal conclusions concerning Jesse's statements and the buccal swabs. The only new argument that Jesse makes in his objections is that his will was overborne by promises not to prosecute him for the Westover burglary and by the officers' references to his familial relationship with Captain Waln.

Jesse's argument is unconvincing. Although Agent Sedlmajer told Jesse that speaking with the police would be "good for you in the long run" Ex. 5 at 00:55–01:01, and that the police could "help" Jesse, Ex. 5 at 09:35–50, 13:35–42, these vague and noncommittal statements were not sufficient to overbear Jesse's will or critically impair his capacity for self-determination. See United States v. Rodebaugh, 798 F.3d 1281, 1293 (10th Cir. 2015) (per curiam) (finding that agent's statement that "If you work with us, we'll go easy on you," was a permissible interrogation tactic that did not render the confession involuntary); LeBrun, 363 F.3d at 725

15

("[A] promise made by law enforcement does not render a confession involuntary per se.") (quotation omitted); United States v. Rutledge, 900 F.2d 1127, 1130–31 (7th Cir. 1990) (holding that agent's statement that "all cooperation is helpful" did not make a confession involuntary). And Agent Sedlmajer never told Jesse that he would not be prosecuted for the Westover burglary. Rather, after Jesse confessed to taking the Michael Jordan poster, Agent Sedlmajer said he didn't know how they were going to "get out of that one." Ex. 5 at 46:28–47:21. Later in the interview, Agent Sedlmajer told Jesse that if he gave information about drug dealing on the reservation, Agent Sedlmajer could not necessarily "make Michael Jordan go away," but he could "push the word up the chain" that Jesse had cooperated. Ex. 5 at 59:55–1:00:40. Agent Sedlmajer stressed, however, that whether Jesse's cooperation would help him was not a decision Agent Sedlmajer had the authority to make. Ex. 5 at 1:00:25–52. Contrary to Jesse's argument, Agent Sedlmajer's statements do not constitute an implied promise that Jesse would not be prosecuted for the Westover burglary. As for Jesse's argument about his relationship with Captain Waln, Agent Sedlmajer never came anywhere close to saying something about Captain Waln that would have affected Jesse's decision to speak with the police, waive his rights, or give the buccal swabs.

### E. Fruit of the poisonous tree

Jesse argued unsuccessfully to Judge Moreno that the buccal swabs should be suppressed as fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963). Jesse now objects to Judge Moreno's recommendation to the contrary. Because the police did not violate the Fourth Amendment, Jesse's fruit-of-the-poisonous-tree argument fails.

## III. Conclusion

For the reasons explained above, it is hereby

ORDERED that Defendants' objections to the Report and Recommendation, Docs. 235, 243, 244, are denied. It is further

ORDERED that the Report and Recommendation, Doc. 223, is adopted. It is finally

ORDERED that Defendants' Motions to Suppress, Docs. 134, 136, 161, are denied.

DATED this 5th day of December, 2017.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE